IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,      )
                               )
              v.               )        Criminal No. 07-303-1
                               )
DWAYNE THOMPSON,               )
A/K/A WHITE CHOCOLATE,         )
A/K/A "D"                      )
              Defendant.       )

## MEMORANDUM OPINION

CONTI, District Judge.

Defendant Dwayne Thompson ("defendant") filed three motions to suppress evidence (ECF Nos. 181, 367, 537) respectively on January 14, 2008, March 10, 2009, and October 13, 2009. In this memorandum opinion the court considers defendant's request to suppress the following evidence: (1) statements he made to Drug Enforcement Administration ("DEA") special agents between July 18 and 19, 2007; and (2) financial records and other evidence obtained by administrative subpoena or informal request.

*Background*

On March 26, 2009, the grand jury returned a Second Superseding Indictment against defendant on two counts: (1) conspiracy to possess with intent to distribute more than five kilograms of cocaine in violation of 21 U.S.C. § 846; and (2) conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956(h). Defendant seeks to suppress statements and evidence with respect to each count.

A suppression hearing was held on September 8 and 9, 2010 concerning, *inter alia*, defendant's motions to suppress evidence related to search warrants, electronic surveillance, and a Texas traffic stop in 2007 (ECF No. 181). At the hearing, the court denied those suppression

motions on the record after considering the evidence presented and the arguments of counsel. The court held, with respect to the Texas traffic stop, that the trooper had a reasonable articulable suspicion, based upon the totality of the circumstances and the officer's experience and training, to further detain defendant and conduct an investigatory stop after the initial stop, in conformity with the requirements under the Fourth Amendment. (Hr'g Tr. Sept. 8, 2010 ("Tr. 1") (ECF No. 714) at 121-22.) The reasonable articulable suspicion was based upon the following facts: (1) the stop for a traffic violation occurred on a known drug corridor; (2) Thompson exhibited nervousness, including an inability to make eye contact; (3) Thompson's story regarding his trip was inconsistent; (4) Thompson's luggage (one small bag) was not commensurate with a three-week trip; and (5) Thompson made inconsistent statements with respect to his criminal record. (Id.) The court found there was no undue diligence involved in calling the K-9 unit or in the K-9 unit coming from the location where the call was received by the K-9 officer after Thompson made clear he would not consent to a search of his vehicle. (Id. at 122.)

The court held, with respect to the affidavits for 2255 Rippling Way and 15543 Sharon Court, that there was probable cause for the issuance of the search warrants. (Hr'g Tr. Sept. 9, 2010 ("Tr. 2") (ECF No. 715) at 12-13.) The court's holding was based upon all the information set forth in the affidavits concerning the alleged drug activity and the affiant's experience with respect to narcotic traffickers keeping at their residence contraband such as drugs, guns, and records relating to their drug activity. (Id.) The court found the affidavits contained a recitation of the factual background for probable cause which included, among other things: (1) the cooperation of witnesses implicating Thompson's involvement in the Cali Connect crew and in distributing cocaine in and throughout Beaver County, Pennsylvania and Allegheny County, Pennsylvania; (2) at least six confidential informants who provided specific information with

respect to the drug activities relating to the targets of the investigation, including Thompson; (3) pen register information; (4) a controlled buy from one of the alleged co-conspirators, Ricky Riley ("Riley"); (5) information from Title III intercepts that included conversations between Riley and Thompson; and (6) the affiant's belief that during the conversations reflected in the affidavits, Thompson was involved in organizing the sale of cocaine.  (Id.)

The court explained that, even assuming the affidavits lacked probable cause, under United States v. Leon, 468 U.S. 897 (1984), there would be a sufficient basis to find good faith or that the officers acted "in objectively reasonable reliance" on the search warrants in question. (Id.); see Leon, 458 U.S. at 922.

The court held, with respect to the electronic surveillance, that the affidavits supporting the Title III wiretap applications were sufficient for probable cause.  (Tr. 2 at 30.)  The affiant was a DEA officer who had a background in these kinds of investigations.  (Id. at 26.)  The information in the affidavits included the criminal histories of the targets of the investigation, including Thompson.  (Id.)  The affidavits reflected that during an investigation in June 2004, it became known from cooperating sources that Thompson was heading an illegal drug distribution organization and was responsible for distribution in Detroit, Michigan; Akron, Ohio; Atlanta, Georgia; Indianapolis, Indiana; California; and western Pennsylvania.  (Id.)  The affidavits described the interaction between a confidential informant, Thompson, and Riley.  (Id. at 27.)  One informant related that Thompson was bringing approximately ten to twenty pounds of marijuana and delivering two to four kilograms of cocaine each month to Beaver County, Pennsylvania.  (Id.)  The affidavits reference a search warrant issued for text message communication over Thompson's Nextel telephone, and there were several text messages

obtained that implicated drug activity.  (Id.)  The affidavits contained pen register information indicating calls between Thompson and Riley.  (Id.)

There was a detailed review by the affiant of the need for the interceptions, including the investigative procedures used.  (Id. at 28.)  The affiant stated, however, that the procedures used were unsuccessful in ascertaining the full scope of the operation or in securing the identities of all the individuals involved in the enterprise.  (Id.)  The affiant concluded that, based upon all the information, only interceptions of oral and electronic communications would suffice to disclose more fully and in greater detail the identities, interactions, respective roles, and extent of involvement of the higher levels of the enterprise.  (Id. at 30.)

The court, after considering all the information in the affidavits, found that the affidavits were sufficient to support probable cause and identify the investigative procedures that were tried and failed or why those procedures were unlikely to succeed if tried.  (Id.)

A continuation of the suppression hearing on the instant motions was held on September 21, 2010.  The court heard testimony from government witnesses and defendant with respect to the motions to suppress statements.  With respect to defendant's motion to suppress evidence relating to a search conducted at the 302 Woodberry address (ECF No. 181), defendant did not contest a lack of standing and the court denied the motion as moot.  With respect to the remaining motions to suppress statements, financial records and other evidence, the court reserved ruling on those motions.  Both defendant and the government submitted supplemental briefs, as well as proposed findings of fact and conclusions of law with respect to the pending motions.

Defendant argues his statements should be suppressed because they were made involuntarily and were a product of coercion.  On June 30, 2010, the government filed its

omnibus response to defendant's motions to suppress statements (ECF No. 661). The government denies that defendant's statements were coerced, arguing the special agents' investigatory techniques fell within the permissible bounds of the law and that, under the totality of the circumstances, defendant knowingly and voluntarily waived his <u>Miranda</u> rights and voluntarily confessed to his role in the offense.

Defendant contests the admissibility of financial records and other evidence on the ground that the evidence was not obtained by a search warrant in violation of the Right to Financial Privacy Act, 12 U.S.C. §§ 3401 *et seq.* On September 23, 2010, the government filed a supplemental response to defendant's motion to suppress financial records and other evidence (ECF No. 693). The government argues defendant's financial records and other evidence were obtained properly by administrative subpoena or grand jury subpoena, and the government's failure to obtain a search warrant did not violate the Right to Financial Privacy Act.

On this 8th day of November, 2010, the court makes the following findings of fact and conclusions of law with respect to the outstanding motions to suppress evidence:

## I. Motions to suppress statements made between July 18 and 19, 2007

### A. Findings of fact

#### a. Thompson's background

1. Defendant is a high school graduate and based upon his testimony understands English. (Hr'g Tr. Sept. 21, 2010 ("Tr. 3") (ECF No. 701) at 122.) Defendant was an assistant manager of a McDonald's restaurant for approximately six years and represented that in his capacity as assistant manager he never signed documents without reading them. (<u>Id.</u> at 123.)

2.      Defendant was arrested for fourteen separate offenses in various states between 1987 and

2001; four of those arrests resulted in convictions.  (<u>Id.</u> at 110-11.)  Thompson was

convicted of the following charges: two counts for cocaine possession; one count for

driving while suspended; and one count for prior convicted felon in possession of a

firearm.  (<u>Id.</u> at 111.)

### b.  Events of July 18 – 20, 2007

3.      On July 18, 2007, DEA special agents and task force officers ("TFOs") executed a search

warrant for defendant's residence at 15543 Sharon Court in Fontana, California and an

arrest warrant for defendant.  (<u>Id.</u> at 5, 10.)

4.      The search warrant for the Sharon Court residence and the arrest warrant for defendant

were contemporaneously executed.  (<u>Id.</u> at 6.)  The warrants were executed and the

search of the residence commenced at approximately 7:15 a.m. and concluded at

approximately 9:40 a.m.  (<u>Id.</u> at 10-11.)  Following his arrest, defendant was escorted

from his residence and placed in a marked police vehicle by TFO Herbert Strobel

("Strobel") and TFO Kolin Price ("Price").  (<u>Id.</u> at 6.)  Defendant was provided a copy of

the search warrant, and read his <u>Miranda</u> rights by Strobel.  (<u>Id.</u>)  A written <u>Miranda</u>

warning was never executed.  (<u>Id.</u> at 44.)

5.      Strobel read defendant his <u>Miranda</u> rights verbatim from a pre-printed card and stopped

after reading each sentence to confirm whether defendant had any questions and that he

understood his rights.  (<u>Id.</u> at 7, 9.)  The information Strobel read to defendant and

contained on the pre-printed card is as follows:

**ORAL  WARNING  TO  BE  GIVEN  TO  A  SUBJECT
PRIOR TO INTERROGATION**

> Before we ask you any questions, you must understand: You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish. Do you understand? Are you willing to answer some questions?

(Ex 1.) While reading defendant his <u>Miranda</u> rights, Strobel observed defendant had a very calm demeanor and gave no indication that he did not understand his rights. (Tr. 3 at 9.)

6.      During the search of defendant's residence, Strobel played CDs of wiretaps to defendant to inform him of "the strength of the case" so he would be "more willing to cooperate." (<u>Id.</u> at 55, 95.) Defendant was informed during the search of his residence that a search warrant was being executed at his mother's residence. (<u>Id.</u> at 95.)

7.      After the search concluded, Strobel and Price transported Thompson to the Los Angeles DEA office for processing. (<u>Id.</u> at 11.) The trip took approximately an hour to an hour and a half. During the trip, Strobel and Price informed defendant about the nature of the charges against him. (<u>Id.</u> at 11-12.) Strobel and Price did not interrogate or question defendant during the trip. (<u>Id.</u> at 12.) While en route to the DEA office, defendant was provided a meal from a fast food restaurant. (<u>Id.</u>)

8.      Defendant arrived at the DEA office at approximately 11:10 a.m. (<u>Id.</u> at 11.) Defendant was processed (i.e., fingerprinted, photographed, etc.) and placed in a holding room after he arrived at the DEA office. (<u>Id.</u> at 12.)

9.      Because of the time expended in conducting the search of the residence and transporting defendant to the DEA office for processing, the TFOs did not bring defendant to the

United States District Court for the Southern District of California that day for an initial appearance. (Id. at 13.) The procedures of the Southern District of California are different from those employed in the United States District Court for the Western District of Pennsylvania. (Id.) In the Southern District of California, initial appearances occur at set times in either the morning or the afternoon (e.g., a "morning docket" or "afternoon docket"). (Id.) The officers had missed the opportunity to bring Thompson for an initial appearance during the morning docket. (Id. at 13-14.)

10. Shortly after 1:30 p.m., Strobel asked defendant "what he wanted to do?" (Id. at 14.) At that time, defendant agreed to cooperate. (Id. at 14, 114.)[1] Defendant testified he cooperated at that time because DEA special agent Christopher Balchon ("Balchon") told him his mother could go to jail, stating, "if I didn't cooperate or if I didn't give them any help in what they were looking for that at that point in time, my mother was either going to go to jail, or get arrested, or something was going to happen there." (Id. at 102.) Balchon testified he did not tell Thompson that his mother would be charged if he did not cooperate. (Id. at 70-71, 124.) Defendant testified at the hearing on September 21, 2010 that his cooperation on July 18, 2007 was "somewhat" related to the fact that his case could benefit from his cooperation with respect to the charges. (Id. at 119, 98.)

11. Balchon was involved with the execution of a search warrant at 302 West Woodbury Road in Altadena, California. (Id. at 64.) The West Woodbury address was the residence of defendant's mother, Bernice Thompson. (Id.) The search of the West Woodbury address concluded at approximately 1:30 p.m., at which time Balchon reported to the

---

[1] Defendant initially testified he decided to cooperate on July 19, 2007 (id. at 105), but later stated he was cooperating on July 18, 2007. (Id. at 114.)

DEA office where defendant was located roughly a half hour away from the West Woodbury address. (<u>Id.</u> at 67.) Balchon was informed by Strobel upon his arrival at the DEA office that defendant was willing to cooperate and had expressed an interest in speaking with the officers and providing information related to other individuals involved in the investigation. (<u>Id.</u> at 67-68.)

12.     At around 2:00 p.m. on July 18, 2007, Strobel and Balchon began to interview defendant about his activities; specifically, his cocaine sources in the Los Angeles area and defendant's alleged co-conspirators. (<u>Id.</u> at 38, 68-69.) The officers observed defendant's demeanor at that time to be very calm, deliberate, soft-spoken, and mild-mannered. (<u>Id.</u> at 68.) The interview was conducted in an interrogation room at the DEA office, defendant was not handcuffed, and the officers did not place their hands on defendant at any time. (<u>Id.</u> at 14-15, 71, 97.)

13.     Defendant provided information to Strobel and Balchon concerning his activities relevant to the charges against him. (<u>Id.</u> at 68.) Defendant agreed to place a series of monitored and recorded telephone calls to William Gregory ("Gregory"), a co-conspirator. (<u>Id.</u> at 20, 69.) Defendant was provided food, including a plain cheese pizza, and allowed to administer insulin for his diabetes during the interview. (<u>Id.</u> at 61, 78.)

14.     On July 18, 2007, defendant's interview was frequently interrupted because other search warrants relevant to the case were being executed in Pennsylvania, Indiana, Ohio, and California. (<u>Id.</u> at 19.) Strobel and Balchon were frequently required to leave the office to answer questions and speak to Los Angeles agents to identify individuals defendant named during the interview. (<u>Id.</u>)

15. Defendant placed a series of telephone calls to Gregory between 5:50 p.m. and 6:50 p.m. in order to solicit a "reverse buy-bust on . . . Gregory in . . . Indianapolis . . . ." (Id. at 20.)

16. At approximately 6:38 p.m., Balchon presented Thompson with a written waiver of his right to a prompt appearance before a United States magistrate judge. (See Ex. 2; Tr. 3 at 21-24.)[2] Balchon read and explained the form to Thompson and explained the penalties Thompson faced as a result of the federal investigation. (Tr. 3 at 76.) The form listed defendant's Miranda rights and Balchon explained those rights to defendant. (Ex. 2; Tr. 3 at 76-77.) Strobel witnessed defendant read the waiver form and Thompson did not have any questions regarding its contents. (Id. at 21-22.) Strobel and Balchon witnessed Thompson signing the form. (Id. at 22, 76.) The form stated: "*This waiver should not be used unless a valid written waiver of Miranda rights has been executed." (Ex. 2 at 1.) The officers did not follow this requirement. (Id. at 44.) The form also contained a blank space where the maximum penalty to the offense charged could be indicated. (Ex. 2 at 1; Tr. 3 at 46.) Strobel did not fill in this section of the waiver form because, at that time, he "would be guessing" what defendant's maximum penalty would be. (Tr. 3 at 46.) Balchon did not fill in this section of the waiver form because the space was small and the charges were explained to Thompson in detail. (Id. at 76.)

17. Balchon observed that, when Thompson signed the waiver form, he did not exhibit any characteristics associated with someone under the influence of a controlled substance or alcohol. (Id. at 77.) Thompson testified he did not read the waiver form, its contents

---

[2] The month on the form was June, not July. (See Ex. 2.) There is no dispute, however, that the form was executed on July 18, 2010.

were not explained to him, and he believed he was signing a consent to search form. (<u>Id.</u> at 100-01.)[3] Defendant, however, later stated he was not sure whether he read the waiver form. (<u>Id.</u> at 101.)

18. Strobel stated the waiver form was signed prior to 6:38 p.m. because before that time, "[i]t just wasn't an issue at the [sic] point. . . . [W]hen it was decided that we were going to house [defendant] overnight, I believe, because we couldn't get [defendant] on the morning docket to begin with, is why this [waiver form] wasn't signed earlier." (<u>Id.</u> at 45 (alterations added).)

19. When asked whether Strobel was "more concerned about getting [defendant's] cooperation for whatever reason than taking him before a district magistrate-judge for presentment," Strobel responded he "was more concerned, [i]t was the course of business . . . [and] that's the way it's done." (<u>Id.</u> at 43 (alterations added).)

20. Strobel and Balchon testified it would be detrimental to an individual willing to cooperate to take him or her immediately before a judge, because, *inter alia*, the public nature of the proceedings could pose a safety risk to a defendant and jeopardize the effectiveness of a defendant's cooperation. (<u>Id.</u> at 59, 74.) For those reasons, the waiver forms are used when a new arrestee agrees that he or she wants to cooperate. (<u>Id.</u> at 74.) A defendant signs the form to delay presentment so that cooperation may take place, i.e., making recorded telephone calls to co-conspirators. (<u>Id.</u>)

21. After Thompson made his last call to Gregory at 6:50 p.m. on July 18, 2007, and after signing the waiver of presentment form, he was transported and housed in the Municipal

---

[3] Defendant's testimony with respect to the waiver form was contradictory. Initially, defendant testified the waiver and two consent to search forms were presented to him for his signature on July 18, 2007. (<u>Id.</u> at 99.) Defendant stated he signed the consent to search form on July 19, 2007. (<u>Id.</u> at 99-100.)

Corrections Center located in Los Angeles, California. (Id. at 79.) Thompson requested that the interview be terminated at that time and the officers honored that request. (Id. at 115.) At that time, defendant made a brief telephone call to his mother. (Id. at 109.)

22.    On the following day, July 19, 2007, Strobel and Balchon retrieved defendant at approximately 12:00 p.m. (Id. at 26, 29.)    At that time, Thompson remained cooperative and executed consent to search forms with respect to the following locations:  (1) a storage unit located on North Michigan Road, Indianapolis; and (2) Apartment J, 2255 Rippling Way, Indianapolis. (Id. at 79, 29; Exs. 3, 4.)  The consent to search forms bearing defendant's signature stated defendant executed them "freely" and was not "threatened, nor forced in any way" to give consent. (Exs. 3, 4.)

23.    Thompson placed two telephone calls to Gregory on July 19, 2007 at 2:13 p.m. and 4:00 p.m. in an attempt to set up Gregory. (Tr. 3 at 80-81.)  Thompson exchanged a series of telephone calls with an associate, Diedre Rush ("Rush"), between 3:47 p.m. and 7:36 p.m. (Id. at 80, 84-87.)  During the exchange, Rush disclosed her knowledge that police activity had occurred in Pittsburgh, Pennsylvania and Ohio, people were arrested and searches conducted. (Id. at 86.)  During the final call Rush made to Thompson at 7:36 p.m., it was clear defendant's arrest was known and nothing further transpired. (Id. at 87-88.)

24.    After the 4:00 p.m. call to Gregory, Thompson requested to call his attorney. (Id. at 82.)[4] At that time Strobel and Balchon excused themselves from the interview room, closed the

<hr />

[4] Defendant testified that throughout the course of his cooperation, he requested to speak with his attorney and those requests were denied. (Id. at 109-10.)  Defendant, however, testified that at the beginning of questioning on July 19, 2007, he requested to speak with his attorney and that request was immediately granted. (Id. at 106.)

door behind them and waited in the hall.  (<u>Id.</u> at 82-83.)[5]  The call was not recorded or

monitored and Thompson made the call on his cell phone when he was not in handcuffs

and was in a secure room.  (<u>Id.</u> at 82-83, 107.)  The officers did not interrupt the call or

eavesdrop on the call.  (<u>Id.</u> at 32.)  After a few minutes Thompson opened the door and

summoned the officers back into the interview room.  (<u>Id.</u> at 83.)  Thompson informed

the officers that his attorney wanted to speak to one of them.  (<u>Id.</u> at 32.)  Strobel talked

to defendant's attorney and informed him defendant was facing serious charges and that

defendant proactively chose to cooperate.  (<u>Id.</u>)

25.     After the last call at 7:36 p.m., Thompson was returned to the Municipal Corrections

        Center and had his initial appearance on the morning of July 20, 2007.  (<u>Id.</u> at 88-89.)


### B.  Conclusions of law

Thompson's motions to suppress statements raise two fundamental issues:  (1) whether he

knowingly, intelligently and voluntarily waived his Fifth Amendment right against self-

incrimination that flows from <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), and its progeny; and (2)

whether defendant's inculpatory statements made subsequent to his alleged waiver of his

<u>Miranda</u> rights were involuntarily coerced in violation of his due process rights.

#### a.  Defendant waived his Fifth Amendment right against self-incrimination

---

[5] Defendant testified the officers did not leave the room during the call and he was not able to have a private conversation with his attorney.  (<u>Id.</u> at 108.)  This testimony is controverted by the officers' testimony and a report prepared by Strobel on August 27, 2007, stating defendant was permitted to speak with his attorney in private.  (<u>Id.</u> at 116.)

1.      The Fifth Amendment privilege against self-incrimination is implicated whenever an

        individual is "taken into custody or otherwise deprived of his freedom by the authorities

        in any significant way and is subjected to questioning."  <u>Miranda</u>, 384 U.S. at 478.

2.      The United States Constitution requires certain procedural safeguards be employed to

        protect the privilege against self-incrimination.  These safeguards require law

        enforcement officers, in accordance with the Fifth Amendment, to ensure that a defendant

        is "warned prior to questioning that he has the right to remain silent, that anything he says

        can be used against him in a court of law, that he has the right to the presence of an

        attorney, and that if he cannot afford an attorney one will be appointed for him prior to

        any questioning if he so desires."  <u>Id.</u>

3.      <u>Miranda</u> and its progeny prohibit a statement made by a defendant during a custodial

        interrogation to be used against the defendant unless the defendant knowingly,

        intelligently, and voluntarily makes the statement.  <u>United States v. Sriyuth</u>, 98 F.3d 739,

        748 (3d Cir. 1996).

4.      "'If [an] interrogation continues without the presence of an attorney and a statement is

        taken, a heavy burden rests on the government to demonstrate that the defendant

        knowingly and intelligently waived his privilege against self-incrimination and his right

        to retained or appointed counsel.'"  <u>North Carolina v. Butler</u>, 441 U.S. 369, 372-73

        (1979) (quoting <u>Miranda</u>, 384 U.S. at 475) (alteration added); <u>see</u> <u>Colorado v. Connelly</u>,

        479 U.S. 157, 168-69 (1986) (the government must prove a defendant's waiver of

        <u>Miranda</u> rights by a preponderance of the evidence); <u>see also</u> <u>Berghuis v. Thompkins</u>,

        130 S. Ct. 2250, 2261-62 (2010) (if the government establishes a <u>Miranda</u> warning was

        given and that it was understood by the accused, a later uncoerced statement constitutes a

valid implied waiver of the accused's right to remain silent).  Unless and until such waiver is demonstrated by the government, no statements resulting from the interrogation may be used against the defendant.  <u>Miranda</u>, 384 U.S. at 479; <u>see</u> <u>Butler</u>, 441 U.S. at 373 (a waiver of <u>Miranda</u> rights can be "inferred from the actions and words of the person interrogated").

5.     When presented with proof of a waiver by the government, the court is required to make a two-pronged inquiry to determine whether the waiver was knowingly, intelligently, and voluntarily made.  <u>Sriyuth</u>, 98 F.3d at 748.

6.     First, the court must determine whether the waiver was voluntary, that is, whether "it was the product of a free and deliberate choice rather than intimidation, coercion or deception."   <u>United States v. Velasquez</u>, 885 F.2d 1076, 1084 (3d Cir. 1989).

7.     Second, the court must inquire whether the waiver "was made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it."  <u>Id.</u>

8.     The ultimate determination whether a waiver was knowingly, intelligently, and voluntarily made depends upon the "totality of the circumstances" surrounding the interrogation, including an examination of "the events that occurred and the background, experience, and conduct of the defendant."  <u>Id.</u>

9.     <u>Miranda</u> rights are deemed waived "only where the totality of the circumstances 'reveal[s] both an uncoerced choice and the requisite level of comprehension.'" <u>Id.</u> (quoting <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986)); <u>see</u> <u>United States v. Pruden</u>, 398 F.3d 241, 246-47 (2005).

10.    Thompson did not challenge whether his <u>Miranda</u> rights were read and that he waived those rights.  Strobel's uncontroverted testimony reveals that he advised defendant of his <u>Miranda</u> rights and defendant did not ask any questions about those rights.  Defendant, a high school graduate, has a history of interactions with the criminal justice system, including four prior convictions.

11.    The unchallenged record reflects an absence of intimidation, coercion, or deception regarding defendant's waiver of his <u>Miranda</u> rights during the morning of July 18, 2007.  Defendant was not handcuffed at the time that he was read his rights, the agents did not display their firearms, and the agents did not make physical contact with defendant.  There is no evidence of record reflecting any type of psychological intimidation utilized by the agents that led to defendant's waiver of his <u>Miranda</u> rights.  Defendant's claim of alleged psychological coercion – the threat that his mother could be arrested – occurred after defendant waived his <u>Miranda</u> rights and agreed to cooperate with the investigation, and the officer's alleged intimidation tactics at that later point in time had no bearing on defendant's decision to cooperate.

12.    Under the circumstances described above, the court concludes that Thompson effectuated a valid waiver of his <u>Miranda</u> rights after he was informed of his rights by Strobel.  The waiver "was made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it."  <u>Velasquez</u>, 885 F.2d at 1084; <u>see</u> <u>Berghuis</u>, 130 S. Ct. at 2262 ("[A]n individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford.").  Thompson knowingly, intelligently, and voluntarily waived his <u>Miranda</u> rights.  The issue whether defendant's subsequent

inculpatory statements were voluntarily obtained in violation of due process, despite the

waiver of his Miranda rights, is discussed below.

> **b. Defendant voluntarily made inculpatory statements and the delay in
> presentment does not warrant suppression**

13.     Although somewhat related, the issue whether a criminal defendant "voluntarily" waived

his Miranda rights is distinct from the issue whether a confession was made "voluntarily"

for purposes of due process concerns.  See Brown v. Cuyler, 669 F.2d 155, 159 (3d Cir.

1982) ("Although there is a conceptual overlap between a claim that, under the totality of

the circumstances, a confession was involuntarily made, and a claim that a confession

was the product of an invalid waiver of the privilege against self-incrimination, we

believe that the issues are distinct") (citing Edwards v. Arizona, 451 U.S. 476, 484

(1981)).[5]  For example, statements made by a defendant under circumstances that violate

Miranda may be used at trial for impeachment purposes if their "trustworthiness . . .

satisfies legal standards."  United States v. Jacobs, 431 F.3d 99, 104 n.7 (3d Cir. 2005)

(quoting Mincey v. Arizona, 437 U.S. 385, 397-98 (1978)).  Involuntary statements

procured in violation of the Due Process Clause, however, may not be introduced at trial

for any purpose.  Mincey, 437 U.S. at 397-98.

14.     Under this analysis, the court must examine the totality of the circumstances to determine

whether a confession has been "made freely, voluntarily and without compulsion or

inducement of any sort."  Withrow v. Williams, 507 U.S. 680, 689 (1993).  The United

States Court of Appeals for the Third Circuit recognized: "In determining whether a

---

[5] The Due Process Clause of the Fifth Amendment provides, in relevant part, that no person shall "be deprived of
life, liberty, or property, without due process of law."  U.S. CONST. AMDT. V.

confession was voluntary, we must satisfy ourselves that the confession was 'the product

of an essentially free and unconstrained choice by its maker,' that it was 'the product of a

rational intellect and a free will' and that the appellant's will was not 'overborne.'"

United States v Swint, 15 F.3d 286, 289 (3d Cir. 1994) (quoting United States ex rel.

Hayward v. Johnson, 508 F.2d 322, 326 (3d Cir. 1975), *overruled on other grounds by*

Patterson v. Cuyler, 729 F.2d 925 (3d Cir. 1984)).

15.    The burden is on the government to prove by a preponderance of the evidence that a

defendant's confession was given voluntarily under the totality of the circumstances.

Swint, 15 F.3d at 289.  The "flexible totality of the circumstances approach requires the

reviewing court to consider the specific tactics utilized by the police in eliciting the

admissions, the details of the interrogation, and the characteristics of the accused."

Miller v. Fenton,796 F.2d 598, 604 (3d Cir. 1986).  The test for voluntariness is not a

"but for" test, because very rarely is any criminal confession made spontaneously to law

enforcement personnel; rather, the test focuses on whether the psychological tactics

employed by law enforcement were so manipulative as to deprive the defendant of an

"ability to make an unconstrained, autonomous decision to confess."  Id. at 604-05.  The

question of "voluntariness" does not turn on the truth or falsity of the confession.  Rogers

v. Richmond, 365 U.S. 534 (1961).

16.    As a threshold issue, in order to find a confession involuntary, the court must find that the

confession was causally related to the misconduct of law enforcement personnel.

Connelly, 479 U.S. at 164.  Law enforcement misconduct may consist of physical

intimidation, psychological pressure, or the application of drugs or medication to induce a

confession.  Townsend v. Sain, 372 U.S. 293, 307 (1963).  Courts may also consider

additional circumstances such as the length of the interrogation, its location, and its

continuity; as well as the defendant's maturity, education, physical condition, and mental

health; and the failure of the police to advise the defendant of his rights to remain silent

and to have counsel present during custodial interrogation. See Withrow, 507 U.S. at

693-94.

17.     When an interrogation is accompanied by physical violence, a *per se* rule of

involuntariness applies. With respect to alleged psychological coercion, however,

> "the line between proper and permissible police conduct
> and techniques and methods offensive to due process is, at
> best, a difficult one to draw, particularly . . . where it is
> necessary to make fine judgments as to the effect of
> psychologically coercive pressures and inducements on the
> mind and will of an accused."

Miller, 796 F.2d at 604 (quoting Haynes v. Washington, 373 U.S. 503, 515 (1963)). Law

enforcement personnel may employ deceptive psychological tactics within the bounds of

the law; a lie told by law enforcement personnel does not necessarily render a confession

involuntary, but rather is a factor to consider under the totality of the circumstances.

Velasquez, 885 F.2d at 1088 (citing Frazier v. Cupp, 394 U.S. 731, 739 (1969) (rejected

contention that confession made after police misrepresented to defendant that co-

defendant had confessed to murder was involuntary under totality of circumstances,

considering defendant's age, maturity, intelligence, length of detention, and fact that

defendant was given warnings of his constitutional rights prior to making statement));

see Miller, 796 F.2d at 607 ("[w]hile a lie told to the detainee about an important aspect

of the case may affect the voluntariness of the confession, the effect of the lie must be

analyzed in the context of all the circumstances of the investigation"); see also United

States v. Palmer, 203 F.3d 55, 62 (1st Cir. 2000); United States v. Carter, 910 F.2d 1524, 1529 (7th Cir. 1990).

18.     The United States Court of Appeals for the Third Circuit has adopted the following

framework for evaluating the effect of delays between Miranda warnings and custodial

statements:

> The first question is whether [the defendant] knew and understood his rights at the time the Miranda warnings were [first] given . . . . The second question is whether the passage of time or an intervening event rendered [the defendant] unable to effectively waive his Miranda rights when he was questioned again . . . .

Pruden, 398 F.3d at 243, 247 (holding the defendant waived his Miranda rights twenty

hours after his initial valid waiver when he "was clearly aware of his rights, and that no

intervening events prevented him from making a knowing and intelligent waiver").

19.     Under a totality of the circumstances approach, the court credits Balchon's testimony that

he did not make misleading statements to defendant concerning his mother.  Even

assuming such statements were made, they did not render defendant's subsequent

statements involuntary.  There is no indication from the record that defendant, an adult

male who had four prior convictions, was susceptible to psychological pressures as a

result of his age, intelligence, or maturity.  See Davis v. North Carolina, 384 U.S. 737

(1966).  The record does not show that defendant suffered from any physical ailments

that might have made him more susceptible to the officers' line of inquiry.  See Reck v.

Pate, 367 U.S. 433 (1961).

20.     The length of defendant's interview lasted for approximately five hours on July 18, 2007,

and seven hours on July 19, 2007.  While the interview appears protracted, the delay was

reasonable under the totality of the circumstances.  Breaks were taken throughout the interview, food was provided, defendant was permitted to administer insulin, and the interview on the first day was immediately terminated upon defendant's request.  The interview was located in an interrogation room at the DEA office, defendant was not handcuffed, and the officers did not place their hands on defendant at any time.

See Connelly, 479 U.S. at 169 n.1. (collecting decisions).  Defendant was read his rights, indicated that he understood those rights, and, as this court held above, effectuated a valid waiver of those rights prior to answering any questions from the officers.  See Frazier v. Culp, 394 U.S. at 739 (fact that the defendant received warnings of his rights highly relevant to issue of voluntariness of statement).  Defendant, while at the DEA office, was permitted to call his attorney upon request, and he was aware on the basis of the Miranda warnings that he received that he was able to request a lawyer at any time during the questioning on July 18 and 19, 2007.  The delay was extended by defendant's willingness to cooperate and his placing calls to Gregory over the two-day period in an effort to assist the government in obtaining evidence against Gregory.

21.     Under the framework established in Pruden and considering the totality of the circumstances in this case, the court finds that defendant knew and understood his rights at the time the Miranda warnings were first given on the morning of July 18, 2007 and that the passage of time between the warnings and the questioning (seven hours), and any intervening event did not impair the defendant's ability to waive effectively his Miranda rights when he later made custodial statements.  Beyond the passage of time, the only events that could have lessened the effectiveness of defendant's waiver were: (1) the alleged intimidation tactics of Balchon with respect to defendant's mother; and (2)

defendant's alleged inability to make a private telephone call to his attorney on July 19, 2007.

22.   Defendant's testimony concerning Balchon's alleged intimidation tactics were controverted by the timing of the events on July 18, 2007. Defendant testified that he cooperated because Balchon said his mother would be arrested and incarcerated if he failed to cooperate. Defendant asserted those tactics rendered his statements involuntary. Balchon, however, testified that when he arrived at the DEA office at 2:00 p.m. on July 18, 2007, defendant had already communicated to Strobel his willingness to cooperate. Defendant's testimony was further controverted by the fact that he cooperated because he believed it would benefit his circumstances with respect to the charges against him. The court credits Balchon's testimony that he did not threaten defendant's mother and did not otherwise intimidate defendant.

23.   Defendant's allegation that he was not permitted to make a telephone call to his attorney in private is controverted by Strobel's report prepared approximately five weeks after the interview, indicating defendant was permitted to speak with his attorney in private.

24.   There is no evidence to suggest that at any time during the two-day interview defendant was mistreated or deprived of food or sleep. See Pruden, 398 F.3d at 247. Defendant was questioned by the same officers about the same offenses, there were no surprises and no evidence that the circumstances of the questioning were particularly intimidating. See id. To the contrary, the officer's uncontroverted testimony explained that at all times during the interview process, defendant was very calm, soft-spoken, and deliberate in his demeanor and his decision to cooperate. Those are not the traits of one enduring intimidation.

25.     The delay of defendant's presentment to a magistrate judge in this case does not warrant

suppression of his voluntary statements.  The United States Supreme Court has held

voluntary confessions are inadmissible if given after an unreasonable delay in

presentment.  Corley v. United States, 129 S. Ct. 1558, 1563 (2009).  The Court held in

Corley that 18 U.S.C. § 3501 ("§ 3501") modified the rule in McNabb v. United States,

318 U.S. 332 (1943), and Mallory v. United States, 354 U.S. 449 (1957), "under which

an arrested person's confession is inadmissible if given after an unreasonable delay in

bringing him before a judge."  Corley, 129 S. Ct. at 1562.

> Under the rule as modified by § 3501(c), a district court
> with a suppression claim must find whether the defendant
> confessed within six hours of arrest (unless a longer delay
> was "reasonable considering the means of transportation
> and the distance to be traveled to the nearest available
> [magistrate]").  If the confession came within that period, it
> is admissible, subject to the other Rules of Evidence, so
> long as it was "made voluntarily and . . . the weight to be
> given [it] is left to the jury."  If the confession occurred
> before presentment and beyond six hours, however, the
> court must decide whether delaying that long was
> unreasonable or unnecessary under the McNabb-Mallory
> cases, and if it was, the confession is to be suppressed.

Corley, 129 S. Ct. at 1571 (citation omitted).

26.     When a confession occurs before presentment and beyond six hours of arrest, courts have

found delays reasonable or excludable when the delay is attributable to "routine

processing, transportation, overnight lodging, and a defendant's cooperation with

authorities . . . ."  United States v. Pena Ontiveros, 547 F. Supp. 2d 323, 339 (S.D.N.Y.

2008); see United States v. Ramirez, 696 F. Supp. 2d 246, 261 (E.D.N.Y. 2010); see also

United States v. Redlightning, 2010 WL 4158583, at *12 (9th Cir. 2010) (holding

overnight presentment delay was reasonable when "no magistrate judge was reasonably

available until 2:30 p.m. on [the following day], when the next arraignment calendar commenced"); United States v. Murray, 197 F.R.D. 421, 423 (S.D. Cal. 2000) (availability of magistrate judge can be a factor in determining whether delay was reasonable). Several circuits have held a defendant's "valid Miranda waiver also waives the prompt judicial warning of one's constitutional rights" under McNabb-Mallory. United States v. Barlow, 693 F.2d 954, 959 (6th Cir. 1982) (collecting cases);[6] see Gov't of Virgin Islands v. Kirnon, 377 F. Supp. 601, 613 (D.V.I. 1974) ("This result seems to be necessary in order to avoid the absurdity of permitting voluntary questioning after a Miranda waiver but concluding that the confession obtained was inadmissible because the defendant was questioned rather than taken to a magistrate as quickly as possible.").

27. Defendant was arrested at approximately 7:15 a.m. on July 18, 2007. Under Corley and § 3501, the officers should have presented defendant before a magistrate judge by 1:15 p.m. that day. Defendant agreed to cooperate with the officers at approximately 1:30 p.m. Defendant continued to cooperate in the investigation, signed a presentment waiver at 6:38 p.m. on July 18, 2010, and was not presented before a magistrate judge until the morning docket on July 20, 2007 – roughly 48 hours after his arrest. Defendant's statements were therefore before presentment and beyond six hours after arrest. The court must determine whether the delay was unreasonable or unnecessary under McNabb-Mallory.

28. The delay before defendant waived his Miranda rights and signed the presentment waiver form was caused by a number of factors, including: (1) the search of defendant's

---

[6] The majority in Corley did not address whether those decisions holding a valid Miranda waiver constitutes a presentment waiver are still good law. See Corley, 129 S. Ct. at 1575 (Scalia, J., dissenting) ("Whether or not those decisions are correct, it is certainly not clear that the McNabb-Mallory rule adds much protection beyond that provided by Miranda.").

residence; (2) transporting defendant to the DEA office and providing him with food; (3) processing defendant at the DEA office; (4) defendant's agreement to cooperate and assist the officers in conducting the investigation; and (5) the missed opportunity to bring defendant for an initial appearance during the morning docket. Defendant was voluntarily cooperating on July 18 and 19, 2007. On July 18, 2007 defendant waived his Miranda rights and he knowingly, intentionally and voluntarily signed a waiver to delay his presentment. The waiver form was read and explained to defendant and the penalties against him were verbally described. The failure to have a written waiver of Miranda rights signed and to fill in the blank concerning the penalties did not make the waiver invalid because, prior to defendant signing the waiver, he was read and understood his Miranda rights and was told what the penalties were. Taken collectively under the circumstances described above, the evidence is sufficient to prove that the presentment delay was reasonable under the circumstances. Defendant's statements should not be suppressed.

## II. Supplemental motions to suppress financial records and other evidence

Defendant filed supplemental motions to suppress financial records and other evidence obtained by subpoena (ECF Nos. 367, 537). In defendant's motions he requests the court to suppress financial records and other evidence obtained by the government because such evidence was obtained either without a warrant in violation of the Fourth Amendment, or in violation of the Right to Financial Privacy Act ("RFPA"), 12 U.S.C. §§ 3401 *et seq.* (See Def.'s Supplemental Br. (ECF No. 689).) The government responds that all evidence defendant

references in his motion was properly obtained by administrative or grand jury subpoena, and that a violation of the RFPA does not render the financial records inadmissible.

### A.  Factual background

Defendant asserts that various evidence was obtained by the government improperly and questions in general how certain information was obtained, including: (1) money order receipts; (2) miscellaneous documents obtained during the search of 15533 Sharon Court, Fontana, CA; (3) miscellaneous documents and receipts obtained during the search of 2255 North Rippling Way, Indianapolis, IN; (4) large quantities of financial records such as checks, deposit documentation, receipts and other financial data; (5) toll records and pen registers; (6) GPS information; and (7) an airline travel document.  (Def.'s Supplemental Br. (ECF No. 689) at 2-3.) Defendant was not privy to the government's methods used to obtain the challenged evidence. (Id. at 1.)

The government responds that agents acquired large amounts of evidence regarding defendant, most of which were obtained from third parties by means of grand jury subpoena or DEA administrative subpoena.  (Gov't's Supplemental Resp. (ECF No. 693) at 1-2; see 21 U.S.C. § 876(a) ("§ 876(a)").)  The records obtained by administrative subpoena include:  (1) hotel records; (2) flight information; (3) telephone toll records; and (4) telephone subscriber information.  (Gov't's Supplemental Resp. at 2.)  The government contends the financial records defendant references were obtained pursuant to grand jury subpoena.  (Id.)

### B.  Discussion

#### a.  Administrative subpoenas

First, the court considers the evidence obtained by administrative subpoenas. The government argues it acquired the contested evidence pursuant to 21 U.S.C. § 876(a). Section 876(a) reads, in pertinent part:

> (a) Authorization of use by Attorney General
>
> In any investigation relating to his function under this subchapter with respect to controlled substances, . . . the Attorney General may subpoena witnesses, compel the attendance and testimony of witnesses, and require the production of any records (including books, papers, documents, and other tangible things which constitute or contain evidence) which the Attorney General finds relevant or material to the investigation.

21 U.S.C. § 876(a).

It is well established that "a court may not exclude evidence under the Fourth Amendment unless it finds that an unlawful search and seizure violated the defendant's own constitutional rights." United States v. Payner, 447 U.S. 727, 731 (1980). "A defendant's Fourth Amendment rights are violated only when the challenged conduct invaded *his* legitimate expectation of privacy rather than that of a third party." Id.; see Pennsylvania Psychiatric v. Green Spring Health, 280 F.3d 278, 291 n.15 (3d Cir. 2002) ("[A] litigant may not assert a third party's Fourth Amendment rights against unreasonable search and seizure to prevent admission of damaging evidence.").

When DEA administrative subpoenas are issued to third parties pursuant to § 876(a), courts have held defendants lack standing to dispute their issuance. See, e.g., United States v. Plunk, 153 F.3d 1011, 1020 (9th Cir. 1998) (defendant lacked standing to challenge subpoenas of telephone records issued to third-party businesses because the subpoenas were not directed at the defendant), *amended by* 161 F.3d 1195 (9th Cir. 1998), *abrogated on other grounds by* United States v. Hankey, 203 F.3d 1160, 1169 n.7 (9th Cir. 2000); United States v. Phibbs, 999 F.2d

1053, 1077 (6th Cir. 1993) (credit card statements and telephone records); <u>United States v.</u>

<u>Mountain States Tel. & Tel. Co., Inc.</u>, 516 F. Supp. 225, 231 (D. Wyo. 1981) (toll records);

<u>United States v. Key</u>, 09-179, 2010 WL 3463756, at *1 (W.D. Ky. Sept. 1, 2010) (airline

passenger records); <u>see</u> <u>also</u> <u>Payner</u>, 447 U.S. at 732 (respondent lacked standing to suppress

bank records illegally seized from a third party).

 A defendant demonstrates standing to challenge administrative subpoenas issued to third

parties when he can show "a legitimate expectation of privacy attaching to the records obtained."

<u>Phibbs</u>, 999 F.2d at 1077. Here, defendant does not assert any cognizable privacy interest in the

records obtained by administrative subpoena. Defendant simply states the government "may not

obtain by subpoena or informal request/demand that evidence which it is unable to obtain, or

inconveniently able to obtain, by search warrant." (Def.'s Supplemental Br. (ECF No. 689) at

3.) Defendant's blanket assertion that the government had an obligation to obtain the challenged

records by search warrant is unavailing and contrary to relevant caselaw. The court holds

defendant did not demonstrate a legitimate privacy interest in the records obtained and lacks

Fourth Amendment standing to challenge the DEA administrative subpoenas to third parties.

<u>See</u> <u>Phibbs</u>, 999 F.2d at 1078 (defendant did not have a legitimate privacy interest in credit card

statements and telephone records when "the information contained within them was readily

accessible to employees during the normal course of business"); <u>Mountain States</u>, 516 F. Supp.

at 231 (defendant's toll records were the property of the third party and were thus not under his

control or command).

  **b. Financial records**

 Defendant seeks to suppress all financial records obtained by the government, alleging

the records were obtained by subpoena in violation of the RFPA. The government responds that

all financial records were obtained by grand jury subpoena and a violation of the RFPA does not

necessitate suppression under the exclusionary rule.  The RFPA provides, in relevant part:

> (i) Disclosure pursuant to issuance of subpena or court order respecting grand jury proceeding
>
> Nothing in this chapter . . . shall apply to any subpena or court order issued in connection with proceedings before a grand jury, except that a court shall have authority to order a financial institution, on which a grand jury subpoena for customer records has been served, not to notify the customer of the existence of the subpoena or information that has been furnished to the grand jury, under the circumstances and for the period specified and pursuant to the procedures established in section 3409 of this title.

12 U.S.C. § 3413(i).

"Generally, the [RFPA] was intended to protect the customers of financial institutions

from unwarranted intrusion into their records while at the same time accommodating legitimate

law enforcement activities."  Pittsburgh Nat'l Bank v. United States, 771 F.2d 73, 75 (3d Cir.

1985).  The RFPA was a legislative answer to the Supreme Court's decision in United States v.

Miller, 425 U.S. 435 (1976).  The Court in Miller held a depositor lacked a legitimate Fourth

Amendment privacy interest in financial records obtained by the government through subpoenas

*duces tecum* served upon a third-party bank.  Miller, 425 U.S. at 440, 442-44.  While the RFPA

"expanded individuals' right to privacy in bank records of their accounts" post-Miller, the

RFPA's privacy guarantees are statutory, not constitutional.  United States v. Kington, 801 F.2d

733, 737 (5th Cir. 1986).  Because the RFPA did not alter Miller's holding, a violation of the

RFPA is not a violation of a defendant's constitutionally-protected privacy interests under the

Fourth Amendment.  See Kington, 801 F.2d at 737 (the RFPA failed to change the effect of

Miller).  If a violation of the RFPA occurs, the statute proscribes certain civil penalties as the

"only authorized judicial remedies and sanctions for violations . . . ."  12 U.S.C. § 3417(d).

Tellingly, the RFPA does not list suppression as a judicial remedy or sanction for evidence improperly obtained under the statute. See 12 U.S.C. § 3417; United States v. Frazin, 780 F.2d 1461, 1466 (9th Cir. 1986) ("[W]hen properly construed, [the RFPA] excludes a suppression remedy . . . .").

In this instance, defendant argues that financial records obtained by subpoena violated the RFPA because he was not provided notice under the statute that the records were seized. See 12 U.S.C. § 3405. Defendant's argument misses the mark. The financial records in this case were obtained by *grand jury* subpoena. The disclosures of those records are exempt from the notice requirements of the RFPA. 12 U.S.C. § 3413(i) ("Nothing in this chapter . . . shall apply to any subpoena or court order issued in connection with proceedings before a grand jury . . . ."); see Bansal v. Russ, 513 F. Supp. 2d 264, 276 (E.D. Pa. 2007) ("Records obtained pursuant to grand jury subpoena or court order respecting a grand jury proceeding are exempted from the RFPA's notice requirements . . . ."); United States v. Tropp, 725 F. Supp. 482, 487 (D. Wyo. 1989) (same). Thompson was not entitled to notice under the RFPA that his financial records were subpoenaed by a grand jury.

Assuming a violation of the RFPA occurred, defendant lacks standing to suppress the financial records in light of Miller. See supra p. 29. For the foregoing reasons, defendant's motion to suppress financial records and other evidence is denied.

**Conclusion**

For the above reasons, defendant's motions to suppress are denied. An appropriate order will be issued.

By the court:

<u>/s/ Joy Flowers Conti</u>
Joy Flowers Conti
United States District Judge

Dated: November 8, 2010